UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Christopher Barrett,
        Plaintiff,

        v.                           Civil Action No. 5:08-CV-203

Prison Health Services, Inc.,
        Defendant.


**REPORT AND RECOMMENDATION**
(Docs. 57 & 60)


       Plaintiff Christopher Barrett brings this tort action against Defendant Prison Health

Services, Inc. ("PHS"), alleging that PHS is liable for injuries that Barrett suffered when

he was assaulted by a prison inmate in October 2005.  Presently before the Court are the

Parties' Cross Motions for Summary Judgment, which present the issue of whether PHS

owed Barrett a duty of care under the principles of common law negligence.  For the

reasons set forth below, I conclude that PHS owed a duty of care to Barrett, that Barrett's

Motion for Partial Summary Judgment on this issue (Doc. 57) should be GRANTED, and

that PHS's Motion (Doc. 60) should be DENIED.

**Background**

       In October 2005, Barrett was a correctional officer ("CO") employed by the

Vermont Department of Corrections ("DOC") and working in Vermont's Northern State

Correctional Facility ("NSCF").  Inmate Daniel Heart, a Vermont state prisoner, was

incarcerated in the general population of NSCF at that time, the DOC having transferred him there from a more restrictive unit at the Southern State Correctional Facility ("SSCF") on September 23, 2005. On October 2, Barrett was supervising inmates in the prison's cafeteria when Heart entered wearing attire that violated the institution's cafeteria dress code. Barrett instructed Heart to leave the cafeteria and to change his clothing before returning. According to Barrett, Heart responded initially by poking Barrett in the chest, demanding that the "chow line" be open upon his return, and walking away. (Doc. 57-2, Barrett Dep. 76-81.) When Barrett followed Heart, Heart turned back around and assaulted him, causing injuries for which Barrett now seeks legal redress. (Docs. 31 ¶¶ 46-48; 62-1 ¶¶ 1-3.)

Prior to this assault, Inmate Heart had an already lengthy history of assaultive behavior connected to mental illness. This history includes multiple assaults on both correctional officers and other inmates, periodic "rageful" behavior, an expressed desire to injure others, and diagnoses of polysubstance abuse, schizoaffective disorder, antisocial personality disorder, borderline personality disorder, and anxiety disorder. In 2003, while incarcerated in the Commonwealth of Virginia as part of an inmate transfer program, a Virginia judge ordered Heart committed to a correctional mental health facility because he "presented an imminent danger to others as a result of mental illness." (Doc. 57-5 at 10-11.)

In order to combat his various mental illnesses, and to stabilize his erratic and, at

times, violent behavior, Heart was prescribed a variety of psychiatric medications. In July

2004 Heart was receiving ten different medications, including Zyprexa,[1] a psychotropic

drug used to treat schizophrenia. (Doc. 62-1 ¶ 8.) On July 28, 2005, about two months

prior to his assault on CO Barrett, Heart's prescription for Zyprexa and several other

medications was renewed for a further 90 days. *Id*. ¶ 11.

In January 2005, PHS, a private entity, entered into a personal services contract

("the contract") with the State of Vermont, and assumed the State's constitutional

obligation to provide adequate healthcare to DOC inmates. (Doc. 57-9); *see Estelle v.*

*Gamble*, 429 U.S. 97, 104 (1976). Both Parties agree–and the contract itself makes

clear–that PHS was obligated to provide medical services to inmates that met the National

Commission on Correctional Healthcare ("NCCHC") standards for health services in

prisons, and to do so in accordance with all state and federal laws. (Docs. 62-1 ¶ 10; 57-9

at 5.) It is also undisputed that the State contracted with a separate mental healthcare

provider, Dr. Paul G. Cotton, P.C., to provide services related to the mental health needs

of inmates. (Doc. 57-14 at 1.)

The Parties dispute the extent to which PHS was also responsible for Heart's (and

other inmates') mental healthcare. PHS concedes that it maintained a physician-patient

relationship with Inmate Heart for some purposes, but claims that its "role with respect to

---

[1] "Zyprexa" is a brand name for the generic pyschotropic drug Olanzapine. (Doc. 57-10.) Anti-psychotic or psychotropic medication alters the chemical balance in the brain to cause a reduction in confusion and agitation and a normalization of psychomotor activity. *Dorland's Illustrated Medical Dictionary* 1130 (28th ed. 1994); *see also Washington v. Harper*, 494 U.S. 210, 214 (1990).

the mental health issues that underlie this case was limited to dispensing medications prescribed by" the DOC's separate mental health provider. (Doc. 60 at 10 n.3.) Barrett disagrees, and says that PHS's contract required it to be actively involved with inmates' mental health, and to fulfill a number of duties related to mental healthcare in addition to dispensing prescribed medication. (Doc. 68-2 ¶¶ 2-5.)

In any event, it is undisputed that one of PHS's duties as healthcare provider was to acquire and dispense pharmaceutical drugs, including psychiatric medication, to the inmates for whom they were prescribed. As part of this obligation, PHS was required to document the administration of each medication "on a medication administration record" ("MAR"), and to "clearly indicate" on the MAR "those instances when an inmate refuses a medication or is not available to receive a medication." (Doc. 57-9 at 6-8.) Heart's MAR indicates that PHS failed to administer Zyprexa to Heart from September 1 through September 15, 2005, as well as on September 24 and September 30, 2005 respectively.[2] (Doc. 62-1 ¶¶ 11, 21.)

On February 25, 2009, Barrett filed an Amended Complaint in which he alleges that, along with other failings in the performance of its contractual duties with regard to Inmate Heart, PHS's failure to properly medicate Heart was a proximate cause of the October 2, 2005 assault that injured Barrett. (Doc. 31 ¶ 45.) The Parties have now cross-

---

[2] PHS acknowledges that Heart had a prescription for Zyprexa during this time period, and that his MAR does not indicate that he received Zyprexa on these specified dates. Nonetheless, and despite PHS's contractual obligation to document the dispensation of all medications, PHS disputes that Heart in fact did not receive his Zyprexa as prescribed. (Doc. 62-1 ¶¶ 11, 21.)

4

moved for summary judgment on the issue of whether PHS owed Barrett a legal duty of

care, a finding of which is necessary for Barrett's claim to succeed.

## Standard of Review

Summary judgment should be granted when the record shows there is no genuine

issue as to any material fact and the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(c); *see also City of Burlington v. Hartford Steam Boiler*

*Inspection and Ins. Co.*, 190 F. Supp. 2d 663, 669 (D. Vt. 2002). To decide such a

motion, the trial court must resolve all ambiguities and draw all reasonable inferences in

favor of the non-moving party and decide whether a rational juror could decide in favor

of that party under applicable law. *Id.*; *Scott v. Harris*, 550 U.S. 372, 378 (2007).

However, all "[a]ssessments of credibility and choices between conflicting versions of the

events are matters for the jury, not for the court on summary judgment." *Rule v. Brine,*

*Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

To defeat a properly supported motion for summary judgment, the opposing party

must "do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Instead, "there must be evidence on which the jury could reasonably find for the"

opposing party. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005)

(quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)). And though the Court

must generally accept all of the non-moving party's allegations as true, it will not ignore

uncontested documentary record evidence to do so. *See Hinchliffe v. Costco*, — F. Supp. 2d —, 2009 WL 3536646, *8-9 (D. Vt. 2009); *see also Scott*, 550 U.S. at 378-79 (considering video evidence on summary judgment that contradicts one party's characterization of the facts).

This standard does not change when the parties file cross-motions for summary judgment. In such cases, "the court 'must evaluate each party's motion on its own merits taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Bronx Household of Faith v. Board of Educ. of City of New York*, 492 F.3d 89, 96 (2d Cir. 2007) (quoting *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't. of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

## Discussion

The elements required for a cause of action in common law negligence in Vermont are:

> (1) the defendant must owe a legal *duty* to conform to a certain standard of conduct so as to protect the plaintiff from an unreasonable risk of harm; (2) the defendant must have committed a *breach* of this duty by failing to conform to the standard of conduct required; (3) the defendant's conduct must be the *proximate cause* of the plaintiff's injury; and (4) the plaintiff must have suffered actual loss or *damage*.[3]

*Langle v. Kurkul*, 510 A.2d 1301, 1304 (Vt. 1986); *see also O'Connell v. Killington, Ltd.*,

---

[3] There is no dispute that, since the jurisdiction of this Court is based on the diversity of the Parties, Vermont law governs all substantive issues. 28 U.S.C. § 1332; *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

665 A.2d 39, 42 (Vt. 1995).  The issue presented by the current motions concerns only the first essential element of a negligence claim, that is, whether PHS had a legal duty to protect CO Barrett from the harm that he suffered at the hands of Inmate Heart.  Absent a legal duty of care running from the defendant to the plaintiff, a negligence claim must fail.  *Rubin v. Town of Putney*, 721 A.2d 504, 506 (Vt. 1998); *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342 (1928).  The existence of a duty is primarily a question of law.  *Rubin*, 721 A.2d at 506; Restatement (Second) of Torts § 328B.

Duty is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection,'" *Sorge v. State*, 762 A.2d 816, 820 (Vt. 2000) (quoting *Denis Bail Bonds, Inc. v. State*, 622 A.2d 495, 499 (Vt. 1993) (internal quotation marks omitted)), and whether a duty exists is "ultimately a question of fairness."  *Langle*, 510 A.2d at 1305.  The inquiry requires a consideration of the relationship between the parties, the nature of the risk (including its foreseeability), and the public policy implications of imposing a duty on the defendant to protect against the risk.  *Id*.

Of these considerations, foreseeability of the risk is primary, *Langle*, 510 A.2d at 1305, but an examination of the relationship between all of the parties involved is equally important in cases where, as here, the risk of harm involves the conduct of a third party.  *See, e.g.*, *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 123-24 (2d Cir. 1996).

## I.    Relationship Between The Parties

Defendants are not generally required to protect plaintiffs from even foreseeable harm when, to do so, the defendant must control the conduct of a third person or warn of such conduct.  Restatement (Second) of Torts § 315; *Peck v. Counseling Serv. of Addison County, Inc.*, 499 A.2d 422, 425 (Vt. 1985).

There are, however, two relevant and distinct exceptions to this rule.[4]  First, liability may attach when the defendant stands in a "special relationship" with either the plaintiff or the dangerous third person that imposes upon the defendant a duty to protect the plaintiff from harm.  *Peck*, 499 A.2d at 425; *Welke v. Kuzilla*, 375 N.W.2d 403, 405 (Mich. Ct. App. 1985); Fowler A. Harper & Posey M. Kime, *The Duty To Control The Conduct Of Another*, 45 YALE L.J. 886, 904-905 (1934).  Second, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, is subject to liability to the third person for physical harm resulting from the failure to exercise reasonable care in such undertaking.  Restatement (Second) of Torts § 324A; *Zukatis by Zukatis v. Perry*, 682 A.2d 964, 967-68 (Vt. 1996); *Stanford*, 89 F.3d at 124.  Both exceptions apply in this case, and the allegations of third party conduct will

---

[4] Of note, it would be a mistake to view the general preclusion of liability for third party conduct as an absolute that may be avoided only by applying a specifically enumerated exception.  For example, in *Langle v. Kurkul*, 510 A.2d 1301 (Vt. 1986), Vermont joined a number of other states in recognizing that social hosts have a legal duty to control those guests who are inebriated and who will foreseeably get behind the wheel of a car.  *Id.*  Such duty is not predicated on any special relationship between the host and the guest, or the host and the innocent highway drivers that are potential plaintiffs, but rather on the strong public policy interest in keeping drunk drivers off of the road.  *Id.*

not bar the imposition of a duty on PHS.

### A. PHS's "Special Relationship" With Inmate Heart

In *Peck v. Counseling Serv. of Addison County*, the Vermont Supreme Court found that psychotherapists share a "special relationship" with their patients, and held that "a mental health professional who knows or, based upon the standards of the mental health profession, should know that his or her patient poses a serious risk of danger to an identifiable victim has a duty to exercise reasonable care to protect [the potential victim] from that danger." *Peck*, 499 A.2d at 427; *see also Tarasoff v. Regents of the Univ. of California*, 551 P.2d 334, 343 (Cal. 1976) (same). The Court acknowledged the difficulty in predicting when a particular mental health patient poses a risk to harm others, but explained that "[t]he standard of care for [mental] health professionals adequately takes into account the difficult nature of the problem facing [them]." *Peck*, 499 A.2d at 425 (quoting *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185, 192 (D. Neb. 1980)).

PHS argues that *Peck*'s holding does not extend to this case because PHS had no "definite control" over Heart, and because, unlike the therapist and the dangerous person in *Peck*, PHS and Heart did not share a traditional psychiatrist-patient relationship. (Doc. 60 at 8-10.) Instead, PHS avers that its responsibilities with regard to Heart's mental health treatment involved only dispensing his prescribed medication, thus characterizing itself as nothing more than a pharmacist, or "dispensary," with no active role in treatment,

treatment planning, or diagnosis.[5]  (Doc. 60 at 9-10.)

Upon examining the record in this case, and in particular the various contractual obligations that PHS agreed to undertake, I find that the requisite "special relationship" necessary to impose a duty of care exists between PHS and those DOC inmates, including Inmate Heart, who receive mental healthcare.  First, while a defendant will owe a duty to protect third parties from the conduct of others over whom the defendant exercises "definite control," such control is not necessary to establish the kind of "special relationship" sufficient to impose a duty of care.  *Peck* itself rejects this requirement, explaining, "[w]hether or not there is actual control over an outpatient in a mental health clinic . . . the relationship between a clinical therapist and his or her patient is 'sufficient to create a duty to exercise reasonable care to protect a potential victim of another's conduct.'" *Peck*, 499 A.2d at 425 (quoting *Tarasoff*, 551 P.2d at 343).

Similarly here, while there is no dispute that only the DOC had *custody* of Heart, the relationship between PHS and Heart is not relevantly distinguishable from the psychiatrist-patient relationship that gives rise to a duty of care under *Peck*.  Normally, of course, the Court would have to accept as true PHS's purely factual assertions about its limited role in providing inmate healthcare.  But here there is a voluminous record of

---

[5] As discussed in this Report, PHS argued in its pleadings that PHS and Heart did not share the requisite special relationship necessary to create a duty to protect others from the conduct of Heart.  At the hearing held on these motions, however, PHS conceded that its relationship with Heart exceeded that of a "mere dispensary," and agreed that a "special relationship" within the meaning of *Peck* and § 315 was established.  PHS then rested the entirety of its position on the argument that Heart's attack on Barrett was not sufficiently foreseeable.  (Doc. 85.)

uncontested documentary evidence from which PHS cannot hide, and that, for the sake of weeding out and deferring only those factual disputes that are *genuine*, the Court should not ignore. *See* Fed. R. Civ. P. 56(c)(2).

Contrary to PHS's contentions, its contract, along with its own procedures manual governing its role in Vermont prisons, reveal broad responsibilities to implement prison healthcare that include overlapping duties and continuous interaction with the DOC's mental health provider, Dr. Cotton. In addition to acquiring and dispensing psychiatric medication, PHS was obligated to routinely communicate about mental health issues with both Dr. Cotton and prison staff, and to coordinate comprehensive treatment for inmates in need of mental health care. For instance, PHS was contractually obligated to establish "procedures to ensure an ongoing active interface with the DOC's mental health provider system," along with "treatment teams in conjunction with the mental health providers as appropriate and necessary to ensure an efficient and effective level of care and coordination." (Doc. 57-14 at 1.) Additionally, while it is expressly stated that all services related to mental health shall be provided by the separate mental health provider, PHS nonetheless agreed to "support" mental health services through "collaborative" and "cooperative" work, and to "refer inmates to mental healthcare providers as necessary." *Id*. The contract also required PHS to participate in–or, at least, remain knowledgeable of–inmate "treatment plans in cases involving both [PHS] and DOC mental health provider." *Id*. at 2. By PHS's own admission, "PHS . . . participated in meetings with the

11

Mental Health services provider to coordinate treatment for inmates, such as Mr. Heart."

(Doc. 62-1 ¶ 20.)

Moreover, the contract also states that PHS will communicate with prison staff about inmates with mental health problems specifically for the purpose of ensuring the safety of all actors in the prison community, including correctional officers. The contract explains: "[PHS] and DOC facility administration will communicate no less than weekly about inmates who are . . . mentally ill or suicidal. . . . in order [to] facilitate accurate classification of inmates, which is important for protecting the health and safety of the inmate, other inmates *and staff*." (Doc. 68-10 at 2) (emphasis added). This precise concern–that is, the need for PHS personnel to communicate with the DOC about mental health issues to ensure the safety of prison staff–is echoed in the PHS "Health Services Policy & Procedures Manual."[6] (Doc. 57-22 at 1.)

Finally, PHS's role in the transfer and classification of inmates further demonstrates its intimate involvement with the prison population's mental health issues. On September 22, 2005, the day before Heart was transferred from SSCF to NSCF, a PHS employee completed Heart's "Health Services Transfer Form," which called for

---

[6] PHS says that it was only obligated to communicate with the prison Superintendent, who was in turn "responsible for communicating information about inmates with 'mental instabilities' . . . to . . . security staff[.]" (Doc. 78 at 5.) But the contract speaks for itself and says that "communication must be established and maintained between [PHS] and the Facility Superintendent *and facility staff* to ensure a continuum of care for sick inmates, while maintaining the security and the health and safety of other inmates *and facility staff*." (Doc. 68-10 at 2) (emphasis added.) Second, even if true, PHS's distinction is without relevance. Whether PHS was obligated to communicate with prison staff directly, or only with the DOC Superintendent, it was nonetheless obligated to communicate with the DOC about mentally ill inmates for the safety of, among others, prison security staff. *Id.*

Heart's "Mental Health History" and "Mental Health Special Concerns." (Docs. 57-19 at 2; 57-12 at 1.) Another PHS employee completed the second page of the same form upon Heart's arrival at NSCF, stating that Heart required a mental health referral, and noting "general population" under "other actions taken."[7] (Doc. 57-12 at 2.) Additionally, on September 23, 2005, a PHS employee filled out an "Intake Mental Health Screen/Suicide Prevention form." (Docs. 57-18, 19.) This form asked whether Heart had a history of psychiatric illness and whether he required psychotropic medication. The form also asked whether Heart should be referred to the mental health provider, and, if so, whether that would be a "routine" referral, or one that should happen "ASAP." *Id.* The form indicates that without a mental health referral, the inmate is "approved for general population," thus refuting PHS's claim that it's only role in deciding Heart's residential classification "was to assess whether [he] was medically [as opposed to mentally] fit for such . . . placement." (Doc. 60 at 10.)

All of this uncontested evidence shows that PHS was sufficiently involved with the mental health of Heart and other DOC inmates to impose upon PHS a duty to protect others from the dangers posed by mentally ill inmates. It is true that, in its role as a

---

[7] PHS attempts to minimize the scope of the Health Services Transfer Form, particularly in light of the sparse information actually included therein by PHS staff. (Doc. 62-1 ¶ 14.) For example, the form states that Heart had zero "mental health special concerns," and referred only to his MAR in lieu of listing his prescribed medications. (Doc. 57-12 at 1.) PHS's implicit suggestion that the form requires nothing more seems incredible in light of the same form completed just over one month after Heart's assault on Barrett, on which all of Heart's medications and doses are listed, and which clearly cautions that Heart is "dangerous [and] assaultive" due to his history of mental illness. (Doc. 68-27 at 2.) It is undisputed that a PHS employee completed the November 2005 form as well. (Doc. 78-1 ¶ 70.)

private contractor that provides constitutionally required health services to Vermont prisoners, PHS performs unique, perhaps hybrid functions that may not be comparable to any non-prison treatment provider. But the unique position that PHS occupies within the general field of healthcare does not alone foreclose the possibility of a "special relationship" existing between PHS and Heart. Instead, as is true with the existence of a duty generally, the relationship between the defendant and a dangerous actor–in this case PHS and Inmate Heart–"is measured by the exigencies of the occasion." *Stanford*, 89 F.3d at 124; *see also* Fowler A. Harper & Posey M. Kime, *The Duty To Control The Conduct Of Another*, 45 YALE L.J. 886, 904-905 (1934).

Here, the record shows that, in addition to the physician-patient relationship that PHS concedes, PHS was contractually obligated to manage and be actively involved in all facets of inmate healthcare, including mental health. Although PHS was not responsible for providing Heart's therapy or prescribing his psychiatric medication, PHS had sufficient ability to control Heart via the performance of its contractual responsibilities to warrant a legal duty of care. PHS administered psychiatric medication, made initial psychiatric evaluations for the purpose of mental health referrals, was responsible for communicating with prison officials about mentally ill inmates, and had access to inmate medical records, including their mental health evaluations.

Finally, the exigencies present in the "prison environment, which, 'by definition,' is made up of persons with a 'demonstrated proclivity for antisocial criminal, and often

violent, conduct,'" *Washington v. Harper*, 494 U.S. 210, 225 (1990) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)), enhance the public policy justification in finding the relationship at issue here to be one of sufficient importance to apply a duty of care. Harper & Kime, *supra*, at 904. Accordingly, I conclude that the relationship between Heart and PHS justifies the imposition of a duty to control or warn of the conduct of a third party.

### B.    PHS Agreed to Render Services Necessary for Barrett's Protection

In addition to the relationship between PHS and Heart, the facts here provide an additional basis on which to impose a duty of care that is evidently not present in *Peck*. Unlike the therapist-defendant in *Peck*, PHS knew that in undertaking its duties to provide healthcare to prison inmates, third parties–and in particular, correctional facility staff–would depend on the prudent performance of those duties for their own welfare.[8]

As already stated, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, is subject to liability to the third person for physical harm resulting from the failure to exercise reasonable care in such undertaking. Restatement (Second) of Torts § 324A; *Zukatis by Zukatis,* 682 A.2d

---

[8] While the arguments discussed in *Peck* and *Tarasoff* clearly address whether a therapist must take steps to protect a third party once he or she knows, or should know, that a patient poses a threat, that is different from arguing that a therapist *qua* therapist owes a duty to a third party. In other words, the claim addressed in *Peck* and *Tarasoff* is not that the therapist-defendants are bad therapists, or that if therapists provide poor therapy others will be hurt, it is that they ignored a threat made by a patient to harm others. That claim is made here as well, but in addition to the claim that PHS performed its job poorly with injury to Barrett resulting.

at 967-68.  Under this rule, the relevant inquiry shifts from whether PHS and Heart shared a special relationship, to whether DOC corrections officers necessarily relied on PHS's performance of its contractual obligations for their own protection from this risk.

Contrary to the suggestion by PHS (Docs. 60 at 7; 78 at 11), the defendant need not be in contractual privity with the third person for a duty of care to arise under this theory.  The "duty of vigilance to prevent injury has its source in the law applicable to human relations rather than the narrow conception of privity," *Stanford*, 89 F.3d at 123-24, and the duty to protect third parties is imposed "where the [defendant] is in a position so that anyone of ordinary sense . . . will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to . . . [another]." *Id*. (quoting *Mozingo v. Pitt Cty. Mem'l. Hosp., Inc.*, 400 S.E.2d 747, 753 (N.C. App. 1991)).

Courts have applied this rule in a number circumstances involving the duty to protect from or warn of third party conduct.  *See, e.g.*, *Tenuto v. Lederle Laboratories*, 687 N.E.2d 1300, 1303 (N.Y. 1997) (imposing duty on physician to warn others of risk posed by the physician's patient); *Mozingo v. Pitt Cty. Mem'l. Hosp., Inc.*, 400 S.E.2d 747, 753 (N.C. App. 1991) (imposing duty on defendant-physician to protect patients from the conduct of resident physicians who worked under the defendant's supervision); *Stanford*, 89 F.3d at 124 (citing *Mozingo*, 400 S.E.2d at 752) (imposing duty on airline to protect passengers on subsequent connecting flights from the risk of harm posed by

hijackers).

As the Court of Appeals of New York explained this rule in *Tenuto*, a physician's duty of care will be extended to third parties when "the service performed on behalf of the patient necessarily implicates protection of household members or *other identified persons foreseeably at risk* because of a relationship with the patient, whom the doctor knows or should know may suffer harm by relying on prudent performance of that medical service." *Tenuto*, 687 N.E.2d at 1303 (emphasis added). *Tenuto* involved the duty to protect household members from the patient's contagious disease, but in Vermont the distinction between the risks of contagious disease and the risks of mental illness is not relevant to the question of whether a duty should be imposed. *Peck*, 499 A.2d at 425.

Like the immediate family members of the defendant's patient in *Tenuto*, DOC correctional officers were within the class of "identified persons" depending on PHS to adequately perform its contractual obligations owed to the DOC and its inmates. The obligation to provide penal healthcare runs not only to the individual prisoners and their own medical interests, but also to the "needs of the institution," which include the safety of prison staff from the threat posed by inmates' mental instability. *Washington*, 494 U.S. at 225. And PHS cannot deny that it was aware of this threat, for its own contract and internal policies explicitly recognize that the safety of prison staff depends on the performance of its obligations specifically relating to the *mental health* of DOC inmates. (Docs. 57-22 at 1; 68-10 at 16.)

17

Thus, in addition to the relationship between PHS and Heart, allegations of third party conduct will not preclude finding a duty here because PHS undertook to provide services to the DOC necessary to protect correctional officers from the risk of harm that Barrett suffered in this case.

## II.    The Reasonable Foreseeability Of The Harm To Barrett

Having decided that PHS may be required to use due care to control or warn of the actions of Heart, I turn to the essential question of whether the injury to Barrett was a foreseeable hazard of its failure to use due care in performing its DOC contract.  *See Langle*, 510 A.2d at 1305.  Foreseeability is central to the question of duty, as "[t]he risk reasonably to be perceived defines the duty to be obeyed."  *Stanford*, 89 F.3d at 225 (quoting *Palsgraf*, 248 N.Y. at 344).

Foreseeability to establish a duty focuses on the general threat of harm to others, and whether the defendant's conduct created a "foreseeable zone of risk" into which the plaintiff's injury falls, rather than "whether the defendant could foresee the specific injury that actually occurred."  *Id*.  Both the individual plaintiff and the type of harm alleged must fall within the "zone of risk" to warrant a duty of care.  *Palsgraf*, 248 N.Y. at 342-44.  Thus, the relevant question here is whether it was foreseeable to PHS that its failure to use due care in executing its responsibilities would result in Heart assaulting a corrections officer.

In this case, given the overwhelming number of red flags in Heart's medical file

18

(to which PHS concedes it had access (Docs. 62-1 ¶ 26; 62 at 14; 78 at 6)), along with

PHS's obligations, it was reasonably foreseeable to PHS that a failure to properly manage

Heart's mental healthcare and psychiatric medications would cause an attack on a

corrections officer.

Heart's medical record, which includes all of his mental health evaluations (Doc.

68-16 at 3), is overflowing with concerns about Heart's assaultive behavior and

psychiatric illnesses dating back to 1995. (Docs. 57-19, 20; 68-14, 16, 22, 24, 29.) For

example, a health evaluation completed on June 12, 1995 describes Heart as a "high risk"

to assault prison staff, and noted that he had previously assaulted correctional staff

multiple times, and that he "can be dangerous [at] times." (Doc. 68-29 at 8.) His records

from 1996 indicate that "a meeting was held jointly with Mr. Heart, security staff and

[mental health] staff to discuss Mr. Heart's threatening behavior to staff and others." *Id*.

at 7. In 1999, Heart submitted an inmate medical request form complaining that he felt

irritable, was still having violent and irrational thoughts, and that at times he wanted to

hurt others. *Id*. at 13.

The theme of mentally ill and dangerous inmate recurs in the treatment notes from

Heart's stint in Virginia's prisons. Notes from August 2003, for example, say that Heart

"exhibited violent and assaultive behavior" in that he "attacked an inmate with a broom

handle." The note also put this incident in context, sounding once again what had at that

point become the alarum familiar to any one paying attention to Heart's medical and

penological history: "[Heart] has a history of violent and assaultive behavior[.]" *Id*. at 20.

Heart's difficulties with anger and mental illness persisted upon his return to Vermont. Just over one month prior to the assault on Barrett, Meredith Larson, Psy.D. recorded a note discussing a plan to move Heart to Bravo unit "for approximately 6 months," where he could work with a therapist on anger management, social skills, appearance, and root issues. As Larson explained, "[b]y starting with a unit that has single cells, the likelihood of an incident is greatly reduced." (Doc. 68-24 at 2.) The DOC transferred Heart to general population about one month later.

And finally, on September 15, 2005–just two weeks before the assault on Barrett–Larson noted an increase in anger that Heart attributed "to being off his Zyprexa," and observed that Heart had a fear of hurting others. (Doc. 57-20.) With this mountain of evidence in Heart's medical record one cannot take seriously PHS's complaint that it did not have "either constructive or actual knowledge" that Heart posed a threat to harm others when his mental illnesses were not properly addressed. (Doc. 62 at 13.)

Even with this knowledge, however, PHS claims that it could not have foreseen that its failure to use due care would cause Heart to assault Barrett. PHS's position rests on an excessively narrow view of the "foreseeability" necessary to establish a duty of care. PHS correctly relies on the common sense proposition that neither the mere possibility of harm, nor the hindsight fact that harm actually occurred, necessarily renders the harm foreseeable *ex ante*. *Baisley v. Mississquoi Cemetery Assoc.*, 708 A.2d 924 (Vt.

1998) (Johnson, J., dissenting); *Norris v. Corrections Corp. of America*, 521 F. Supp. 2d 586, 589 (W.D. Ky. 2007). But PHS misapplies the rule to the facts of this case, confusing it to mean that the resulting harm is not foreseeable unless it is all but inevitable. Distilled from its various pleadings, PHS essentially argues that Heart's assault on Barrett was not foreseeable because (1) there was no established correlation between missed doses of medication and assaultive behavior; (2) Heart had not assaulted someone "each time" he missed doses of Zyprexa; (3) Heart did not specifically threaten either Barrett or corrections officers in general "on or remotely prior to 2005"; and (4) Heart had a number of favorable mental health evaluations shortly before his assault on Barrett. (Docs. 60, 78.)

Quite plainly, the general "foreseeable zone of risk" with which the concept of duty is concerned does not require such exacting specificity. As the Second Circuit explained, "there are two concepts of foreseeability, the one specific, the other general. The first concerns the foreseeability of the specific injury the plaintiff suffered, and focuses on whether the defendant's actions are a proximate cause of the harm. The second, and the one at issue [to determine whether a legal duty exists], concerns the general foreseeable risk which is crucial to determining the existence of a duty and helps to limit its scope." *Stanford*, 89 F.3d at 125.

With the law of duty correctly understood, none of the record facts cited by PHS are enough to overcome the ample evidence showing that Heart's assault on Barrett was

objectively foreseeable. For example, it is of little relevance that on September 15, 2005, in addition to noting Heart's increased anger, Larson observed that Heart appeared "[a]lert, oriented" and "cooperative with sessions, showing no problems on the unit[.]" Or that on September 28, 2005, a mental health provider assessed Mr. Heart as "stable," and said that his "[m]ultiple APDS [antipsychotic medications] & mood stabilizers [were] helping." (Doc. 60-2.) Even drawing all reasonable inferences from these isolated treatment notes in favor of PHS, they at most suggest a diminished possibility that Heart would assault someone in the near future, but they do not make that risk *unforeseeable*. Similarly, comments that Heart had "no problems on the unit" on September 15, 2005, when Heart was housed in the restricted Bravo unit at SSCF, are not probative of whether Heart would have similar success in the general population unit at NSCF.

Nor is it particularly significant that Heart did not assault anyone on or around September 15, 2005, after he had allegedly missed fifteen straight days of his medication. (Doc. 62 at 14-15.) For one, it is undisputed that Heart was not housed in general population until his transfer to NSCF on September 23, 2005. But more importantly, the fact that missed doses of Zyprexa did not *always* cause Heart to assault others renders the assault on Barrett no less foreseeable than the collision that finally occurs after a driver runs his fifth consecutive red-light.

Finally, I again note the language from the contract and PHS's Procedures Manual specifically acknowledging the risk that if PHS failed in its obligations with regard to

inmates' mental health–however limited in comparison to Dr. Cotton those obligations may be–the safety of correctional staff would be jeopardized. Specifically, the contract states that PHS must communicate weekly with facility staff about inmates who are "mentally ill or suicidal" to facilitate the "accurate classification of inmates, which is important for protecting the health and safety of the inmate, other inmates and staff." (Doc. 68-10 at 2.)

Thus, it is enough that Heart had a long history of assaultive behavior resulting from mental illness to make it foreseeable that he posed a risk to harm others if his mental illnesses were not properly managed, including by not adequately providing his medication.

PHS's principal argument, however, is that it owed no duty because Barrett was not a "readily identifiable victim." (Doc. 60-13.) Even if an attack of some kind was foreseeable, PHS contends, an attack *on Barrett* was not. While factually correct insofar as Heart did not specifically threaten Barrett, this point misunderstands the law. The "inability to predict the special victim of a dangerous person does not absolve a [defendant] from a duty to use due care to protect others who might foreseeably be endangered by that person." *Div. of Corrections, Dept. of Health & Social Serv. v. Neakok*, 721 P.2d 1121, 1128-29 (Alaska 1986); *see also Welke v. Kuzilla*, 375 N.W.2d 403, 405-406 (Mich. Ct. App. 1985). Even the cases on which PHS relies recognize that a duty to warn may lie when the "plaintiff was within the *class of persons* at risk for that

23

harm." *Brown v. Washington County*, 987 P.2d 1254, 1260 (Ore. App. 1999) (emphasis added).

PHS argues that, under *Peck*, Vermont law does not recognize a duty of care owed to a foreseeable class or group of persons  (Doc. 87), but this view applies *Peck* too broadly.

*Peck* does refer to an "identifiable victim," but, even assuming that is an essential part of its holding, *Peck* is distinguishable from the present case.  *Peck*, 499 A.2d at 427. In the typical psychiatric setting, "[a]nnouncing every generalized threat to the outside world would seriously undermine a therapist's efforts to gain the trust of his patient," *Davis v. Lhim*, 335 N.W.2d 481, 489 (Mich. Ct. App. 1983) *overruled on other grounds by Canon v. Thumudo*, 422 N.W.2d 688 (1988), and confidentially laws may limit the patient information that a mental health professional is allowed to disclose.  *Peck*, 499 A.2d at 426.  Additionally, general warnings to the public about dangerous patients would likely go unheeded by those individuals not specifically threatened.  *Id*.; *Thompson v. County of Alameda*, 614 P.2d 728, 735 (Cal. 1980).  For these reasons, limiting the psychiatrist's duty to protect only those victims that are "readily identifiable" is "an exception to the general foreseeability rule" that is not intended for broader application. *Welke*, 375 N.W.2d at 405 (imposing a duty of care on physician to protect unknown but foreseeable innocent automobile occupants from the risk posed by the physician's patient).

In the prison context, by contrast, there is no concern that PHS will compromise its ability to administer inmate healthcare, or violate any confidentially requirement, by sharing inmate health information with the DOC and its staff. By virtue of its "Business Associate Agreement" with the DOC, PHS is authorized under the Health Information Portability and Accountability Act ("HIPAA") to share with the DOC the Protected Health Information ("PHI") of DOC inmates.[9] (Doc. 68-10 at 3-8); 45 C.F.R. §§ 160.103, 164.502(e).

The prison context also eliminates the dichotomy of imposing a duty to protect only a specifically identified person, and imposing a duty to protect an indeterminate class of persons conceivably injured by the defendant's negligence, i.e., the public at large. When the dangerous person is an inmate with prior assaults on corrections officers, and the defendant has contracted to provide services in a prison environment, it is foreseeable that those people working behind the same prison walls are at risk.[10] Thus, PHS's repeated reminder that Heart posed a risk to "anybody under [the prison's] roof" only proves the point that Heart's assault on Barrett was sufficiently "foreseeable" to establish

---

[9] PHS's contract says, a "correctional institution or law enforcement official with lawful custody of an inmate may have access to PHI for the health and safety of such individual, other inmates, officers, or employees at the correctional institution . . . . Information necessary for the classification, security and control of inmates will be shared with the appropriate Corrections personnel." (Doc. 68-10 at 3.)

[10] Of course it is possible that an inmate could escape prison and harm someone outside of the prison as well, but that case is not presented here, and I take no position as to whether a duty to protect such a plaintiff could exist in the appropriate case. *Cf. Rivera v. New York City Health & Hosp. Corp.*, 191 F. Supp. 2d 412, 418 (S.D.N.Y. 2002) ("In the case of mental health practitioners, however, in certain circumstances this duty is owed not only to patients and the narrow category of individuals the physician could expect to be affected by the treatment, but to the outside public as well.")

a duty of care. (Docs. 60-1 ¶ 21; 60 at 9; 62 at 6 n.5; 87 at 4); *see also Neakok*, 721 P.2d at 1128-29 (applying similar reasoning to find that plaintiffs from a community of only 68 residents into which parolee was released were sufficiently foreseeable).

Heart's medical record is a cautionary tale in the form of treatment notes and evaluations that warn of his violent disposition and its connection to mental illness. Given that, combined with the prison context in which this assault took place, I conclude that both Heart's actions and his victim were within the zone of foreseeable risks of PHS's failure to use due care in executing its contractual responsibilities.

## Conclusion

In sum, because of its role as healthcare provider to DOC inmates–a role that included significant responsibilities pertaining to mental healthcare–PHS shared a relationship with Heart sufficient to impose a duty to protect others from the danger posed by his mental illness. With these same responsibilities, PHS also undertook to provide services to the DOC and its inmates upon which DOC correctional officers relied for their own safety. Finally, given Heart's substantial history of assaultive behavior connected to mental illness, the risk that he would assault a correctional officer was a foreseeable hazard of PHS failing to use due care in executing its contractual obligations, including by failing to correctly administer Heart's prescribed psychotropic medication.

Accordingly, in the performance of its contract with the DOC, PHS was obligated to use reasonable care to protect Barrett from the unreasonable risk of danger posed by

Heart.  Prosser & Keeton, *The Law of Torts* § 53 (5th ed. 1984) ("in negligence cases, the duty is always the same–to conform to the legal standard of reasonable conduct in light of the apparent risk").  As was true of the psychiatrist in *Peck*, there are obvious limits on the ability of PHS to control psychotic inmates, limits that may include knowing when and in what way a particular inmate poses a particular risk.  But while the standard of care legally required of PHS must take such limitations into account, they are not sufficient in this case to eradicate the duty of care entirely.  *See generally Peck*, 499 A.2d at 425.

Of course, this recognition of duty does not necessarily mean that PHS is liable, for the jury must still decide whether PHS's conduct constitutes a failure to use reasonable care, and, if so, whether that breach of duty proximately caused Barrett's injuries.  Prosser & Keaton, *supra*; Restatement (Second) of Torts § 328B.

Because I find a legal duty in tort running from PHS to Barrett, I recommend that Barrett's Partial Motion for Summary Judgment (Doc. 57) be GRANTED, and that PHS's Cross-Motion for Summary Judgment (Doc. 60) be DENIED.

Dated at Burlington, in the District of Vermont, this 19th day of February, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  See Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).