U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2010 JUL 19 PM 3: 04
CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

CHRISTOPHER BARRETT, )
)
Plaintiff, )
)
v. ) Case No. 5:08-CV-203
)
PRISON HEALTH SERVICES, INC., )
)
Defendant. )

**OPINION AND ORDER RE: OBJECTION TO
MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
AND ORDER ON PLAINTIFF'S MOTION TO
SUPPLEMENT THE RECORD**
(Docs. 89, 90-92)

This matter came before the court on the Objection of Defendant Prison Health Services, Inc. ("PHS") (Doc. 92) to the Magistrate Judge's Report and Recommendation ("R & R"), filed on February 19, 2010. (Doc. 90.) In the R & R, the Magistrate Judge recommended granting Plaintiff Christopher Barrett's motion for partial summary judgment, and denying PHS's cross-motion for summary judgment on all claims.

PHS has also filed an Objection (Doc. 91) to the Magistrate Judge's Opinion and Order on Plaintiff's motion to supplement the record with an affidavit from Dr. Thomas Powell. In his Opinion and Order, the Magistrate Judge allowed Mr. Barrett "to supplement the record with Dr. Powell's affidavit so that it may be relied on by the District Judge as the Court may deem appropriate." (Doc. 89 at 2.) Christopher Barrett is represented by David J. Williams, Esq. PHS is represented by Samuel Hoar, Jr., Esq.

A district judge must make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which an objection is made. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1); *Cullen v. United States*, 194 F.3d 401, 405 (2d Cir.

1999). The district judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *accord Cullen*, 194 F.3d at 405.

As a preliminary matter, the court adopts the Magistrate Judge's Opinion and Order permitting Mr. Barrett to supplement the record with the affidavit of Dr. Thomas Powell, former Department of Corrections ("DOC") Director of Clinical Services. The Magistrate Judge's decision in this respect was not an abuse of discretion or otherwise erroneous. The court, however, did not rely on the Powell affidavit in making the rulings set forth herein.

**I.     Undisputed Facts.**

In January of 2005, the State of Vermont and PHS, a private entity, entered into a personal services contract (the "Contract") wherein PHS agreed to provide medical services to inmates that would meet national standards for health services in prisons. Section W of the Contract, entitled "Pharmaceuticals," required PHS to "provide a total pharmaceutical system . . . sufficient to meet the needs of the DOC inmates." Pursuant to the Contract, PHS was also "responsible for the acquisition, storage and administration of pharmaceuticals," maintaining a formulary, and "monitoring the use and availability"of the drugs. (Doc. 57-9 at 6.)

Although the State contracted with a separate provider, Dr. Paul G. Cotton, to provide mental health services to inmates, the Contract gives PHS certain responsibilities with regard to inmates' mental health needs. Section G, entitled "Interface with DOC's Mental Health Services Provider," states that PHS "shall establish procedures to ensure an ongoing active interface with the DOC's mental health provider system . . . to ensure coordination of care occurs for inmates being treated for both physical and mental health problems." (Doc. 57-14 at 1.) With regard to mental health services, Section G (Doc. 57-14 at 1-2) provides:

> The DOC's contractual and State mental health care providers
> shall provide all services related to the mental health needs of
> inmates, including assessment, diagnosis and treatment.

2

> [PHS] shall support these activities as agreed upon with the
> State and refer inmates to mental health care providers as
> necessary. [PHS] shall work collaboratively and
> cooperatively with these providers to ensure open lines of
> communication and comprehensive care for inmates receiving
> medical and mental health care services. . . . Weekly meetings
> shall be held to discuss treatment plans in cases involving
> both [PHS] and DOC['s] Mental Health Provider.

Section N, "Communication on Special Needs," requires "[r]egular channels of communication" to be established and maintained between PHS health care staff, the Facility Superintendent, and facility staff "to ensure a continuum of care for sick [physically or mentally ill] inmates, while maintaining the security and the health and safety of other inmates and facility staff." (Doc. 68-10 at 2.)

In October of 2005, Christopher Barrett was a DOC correctional officer, working at Vermont's Northern State Correctional Facility ("NSCF"). On September 23, 2005, Inmate Daniel Heart was transferred to NSCF's general population from a more restricted unit at the Southern State Correctional Facility.

On October 2, 2005, Mr. Barrett was supervising inmates in the NSCF cafeteria when Mr. Heart entered, wearing attire that violated NSCF's dress code. Mr. Barrett instructed Mr. Heart to change his clothing before returning to the cafeteria. Mr. Heart poked Mr. Barrett in the chest, demanded that the "chow line" be open when he returned, and walked away. When Mr. Barrett followed Mr. Heart, Mr. Heart turned around and assaulted him.

Prior to the incident, Mr. Heart had a lengthy history of assaultive behavior (including assaults on, and threats towards correctional officers and other inmates) apparently related to his mental illness. He was prescribed numerous anti-psychotic medications, including Zyprexa, to stabilize his behavior. According to Mr. Heart's Medication Administration Record, he did not receive his Zyprexa medication between September 1-15, 2005 (before he transferred to NSCF) or on September 24 or 30, 2005. Mr. Barrett alleges that PHS's failure to properly medicate Mr. Heart, along with other

failures in the performance of its contractual duties related to Mr. Heart, was a proximate cause of the October 2, 2005 assault that injured him.

## II. Disputed Facts.

The parties dispute the extent to which PHS was responsible for Mr. Heart's (and other inmates') mental health care. PHS acknowledges that it maintained a physician-patient relationship with Mr. Heart pursuant to the Contract, but asserts that its role concerning Mr. Heart's mental health issues, which form the basis of Mr. Barrett's tort claims, was "limited to dispensing medications" prescribed by Dr. Cotton. In its Statement of Undisputed Material Facts, PHS asserts:

> PHS has *not* entered into a contract with the State to provide mental health services to inmates and PHS was not responsible for monitoring Mr. Heart's psychiatric well-being, diagnosing his mental health problems, providing counseling, or any other such mental health treatment and services.

(Doc. 60-1 at ¶ 2) (emphasis in the original). Mr. Barrett's Opposition claims this factual statement is "Disputed." (Doc. 68-2 at 1.) He points to various provisions in the Contract that, in his view, show a more active role by PHS in inmates' mental health care, such as the requirements to interface with and support DOC's mental health provider, participate in weekly meetings to discuss treatment plans, and meet with prison administrators to discuss needs of inmates with special mental health needs. He also refers to provisions from PHS's internal Policy & Procedures Manual which refer to PHS's supportive role with the psychiatrist. *See, e.g.*, Doc. 68-8 ("[PHS] [m]ental health and nursing staff provide support to psychiatrist to ensure adequate monitoring of inmates['] prescribed psychotropic medication.").

## III. Procedural History.

Mr. Barrett filed a Complaint in September 2008, which he amended in February 2009. In his Amended Complaint, he alleges that the grossly negligent failure of Defendants PHS and Dr. Cotton to adequately manage Mr. Heart's medications and treatment was a proximate cause of the October 2005 assault and his resulting injuries. He also alleges that the Defendants failed to warn him of the danger presented by Mr.

4

Heart upon being transferred to NSCF's general population. Over Mr. Barrett's objection, the Magistrate Judge recommended that the Amended Complaint be dismissed against Dr. Cotton. The district court accepted that recommendation. After discovery, Mr. Barrett moved for partial summary judgment, alleging that "PHS owed a duty to protect him from the obvious and foreseeable risk associated with the failure to provide anti-psychotic medication to a violent psychotic inmate who had been prescribed the medication by his prison psychiatrist." (Doc. 57 at 8, footnote omitted.) In the context of PHS's alleged duty, Mr. Barrett also claimed that PHS was liable for negligent performance of an undertaking, based on its "reckless failure to render medical services necessary to reduce the foreseeable risk posed by inmate Heart if he did not receive his prescription medication." (Doc. 57 at 18.)

PHS cross-moved for summary judgment, asserting that it owed no duty of care to protect or warn Mr. Barrett, as a third party, and therefore his claims sounding in negligence must fail. PHS did not specifically address Mr. Barrett's negligent undertaking claim in its cross-motion.

The Magistrate Judge found that PHS owed a duty of care to Mr. Barrett, and recommended granting Mr. Barrett's motion for partial summary judgment and denying PHS's motion for summary judgment. In particular, the Magistrate Judge concluded that PHS:

> shared a relationship with Heart sufficient to impose a duty to protect others from the danger posed by his mental illness. With these same responsibilities, PHS also undertook to provide services to the DOC and its inmates upon which DOC correctional officers relied for their own safety. Finally, given Heart's substantial history of assaultive behavior connected to mental illness, the risk that he would assault a correctional officer was a foreseeable hazard of PHS failing to use due care in executing its contractual obligations, including by failing to correctly administer Heart's prescribed psychotropic medication.

(Doc. 90 at 26.)

PHS asserts the following objections to the R & R:

> (1) PHS had no duty to warn Plaintiff and the Report's effort to carve out an exception to the requirements for a duty to warn claim if a plaintiff is attacked by a dangerous person, who has made no specific threat of serious harm towards a readily identifiable victim or class of victims, within a prison setting would create a limitless and open-ended duty; and (2) Plaintiff's negligent performance of a duty claim is barred by application of the Fireman's Rule. PH[S] further objects to the confusing structure of and analysis in the Report, which blends together a variety of legal principles in an effort to reach a particular outcome.

(Doc. 92 at 1-2.) PHS also objects to the R & R's alleged conclusion that,

> [a]t the hearing held on these motions . . . , PHS conceded that its relationship with Heart exceeded that of "mere dispensary" and agreed that a "special relationship" within the meaning of Peck and [Restatement (Second) of Torts] § 315 was established. PHS then rested the entirety of its position on the argument that Heart's attack on Barrett was not [sufficiently] foreseeable.

(Doc. 92 at 4-5 (quoting Doc. 90 at 10, n.5.)) The Magistrate Judge made this observation in a footnote. It was not a conclusion, as the R & R did not rely on PHS's statements at oral argument, but proceeded to examine whether a special relationship existed. Having reviewed the transcript of the oral argument, it is not clear that PHS made the particular concession attributed to it by the Magistrate Judge. In any event, on *de novo* review, the court finds the issue immaterial.

### IV. Conclusions of Law and Analysis.

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The court construes the evidence "in the light most favorable to the non-moving party, and draw[s] all inferences and resolv[es] all ambiguities in favor of the nonmoving party." *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 158 (2d Cir. 2007). If a "nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which []he has the burden of proof," the moving party is entitled to summary judgment on that cause of action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)

6

("When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."). When parties file cross-motions for summary judgment, "the court 'must evaluate each party's motion on its own merits taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Bronx Household of Faith v. Bd. of Educ. of the City of New York*, 492 F.3d 89, 96 (2d Cir. 2007) (quoting *Hotel Emps. & Rest. Emps. Union, Local 100 of New York v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

In this case, federal jurisdiction is based on diversity of citizenship. Accordingly, the court applies the substantive law of Vermont, the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

### A. PHS's Objections with Regard to the Failure to Warn/Protect Claim.

PHS challenges the Magistrate Judge's finding that PHS had a legal duty to protect Mr. Barrett from the harm he suffered at the hands of Mr. Heart. Duty "is central to a negligence claim, and its existence is primarily a question of law." *Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 968 A.2d 336. Absent a legal duty, a negligence claim must fail. *Rubin v. Town of Poultney*, 168 Vt. 624, 625, 721 A.2d 504, 506 (1998).

Vermont follows the *Restatement (Second) of Torts* § 315 (1965) ("§ 315") in determining whether there is a duty to protect a third person from harm. In *Peck v. Counseling Serv. of Addison Cnty., Inc.*, 146 Vt. 61, 499 A.2d 422 (1985), the court held that:

> Generally, there is no duty to control the conduct of another in order to protect a third person from harm. *Restatement (Second) of Torts* § 315 (1965). A recognized exception to this general rule arises in the situation "where there is . . . a special relationship between two persons which gives the one a definite control over the actions of the other. . . ." Harper & Kime, *The Duty to Control the Conduct of Another*, 43 Yale L.J. 886, 895 (1934). An exception also arises where a special relationship exists which

7

> imposes a duty upon one to control the actions of another, *Restatement*, *supra*, § 315(a), or, where a special relationship gives a third person a right to protection. *Id.* at § 315(b).

*Peck*, 146 Vt. at 64-65, 499 A.2d at 425. The *Peck* court concluded that, notwithstanding the physician-patient privilege, "a mental health professional who knows or, based upon the standards of the mental health profession, should know that his or her patient poses a serious risk of danger to an identifiable victim has a duty to exercise reasonable care to protect him or her from that danger." *Peck*, 146 Vt. at 68, 499 A.2d at 427. At the time, 18 V.S.A. § 7101(13) (Supp. 1984) defined a "mental health professional" as "a person with professional training, experience and demonstrated competence in the treatment of mental illness, who shall be a physician, psychologist, social worker, nurse or other qualified person designated by the commissioner." *Peck*, 146 Vt. at 63 n.2, 499 A.2d at 423 n.2.

The *Peck* decision aligned Vermont with the vast majority of courts which have concluded that mental health professionals have particular insight into the behavior of their patients (or reasonably should have such insight), and are in the best position to both assess whether a patient poses a risk of physical harm to a third party, and to protect a potential victim through warnings and other appropriate responses. *See, e.g., Tarasoff v. Regents of the Univ. of Calif.*, 551 P.2d 334, 343 (Cal. 1976) (recognizing existence of special relationship between psychotherapist and patient that provided underlying basis for imposition of affirmative duty owed to persons other than the patient); *Restatement (Third) of Torts*: Liability for Physical & Emotional Harm § 41 Reporter's Note cmt. g (Proposed Final Draft No. 1 (2005)) (commenting that "[v]irtually all courts confronting the issue have decided that mental-health professionals owe some affirmative duty to third parties with regard to patients who are recognized as posing dangers," and citing law review articles and cases, including survey that found only one state had declined to adopt a *Tarasoff* duty).

Recognizing that *Peck* is controlling precedent, PHS claims that it did not have a duty to control Mr. Heart, or to warn or protect Mr. Barrett, within § 315's exceptions.

PHS makes four points in this regard. First, it asserts that it did not have "definite control" over Mr. Heart. Second, it maintains that its relationship with Mr. Heart was not analogous to a psychotherapist-patient relationship. Third, it states that it did not possess any "special knowledge" that Mr. Heart intended to harm a third person although it does not dispute the Magistrate Judge's conclusion that Mr. Heart's history of assaults was well-documented in records to which PHS had access. Finally, it contends that because Mr. Heart did not specifically threaten Mr. Barrett, the duty to warn was not triggered. Each of these objections have varying degrees of merit and counsel against adopting the R & R's recommendation.

*Peck* did not specifically define what qualifies as a "special relationship" although it clearly identified three instances in which such a relationship would give rise to a legal duty to control, warn and/or protect: (1) where the relationship "gives the one a definite control over the actions of the other[;]" (2) where the relationship imposes a "duty upon one to control the actions of another[;]" and (3) where the relationship "gives a third person a right to protection." *Peck*, 146 Vt. at 65, 499 A.2d at 425 (citations omitted).

Against this backdrop, the court must determine whether a "special relationship" between PHS and Mr. Heart existed as a matter of law. This, in turn, depends on the scope of PHS's responsibilities for the inmates' mental health, and whether such responsibilities can be analogized to those of a mental health professional. The starting point for this analysis is the Contract between PHS and the State, which delineates PHS's duties with regard to inmate mental health care. Neither of the parties dispute the terms of the Contract. Rather, they each point to different sections of the Contract to support their arguments that PHS did or did not have a "special relationship" with Mr. Heart.

Pursuant to the Contract, PHS did not serve as Mr. Heart's therapist, psychologist, or psychiatrist. On the other hand, PHS was required to do more than simply dispense drugs to inmates. *Cf. Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1280-82 (Nev. 2009) (en banc) (holding that pharmacy, as dispenser of drugs, did not owe a duty of care to prevent pharmacy customer from injuring unidentifiable third party because no special

relationship existed to justify imposing such a duty). The Contract contains competing provisions which both point towards and away from the finding of a "special relationship." Markedly absent from the record, however, is sufficient evidence of whether *in practice*, PHS's interaction with Mr. Heart could be viewed as the equivalent of a mental health professional. For instance, although the Contract appears to require it, the record is unclear regarding whether PHS actually employs individuals who interface with Dr. Cotton regarding inmate mental health issues such that those individuals may reasonably be held to the same standard of care as mental health care professionals. Similarly, although the Contract requires PHS to provide a "total pharmaceutical system sufficient to meet the needs of DOC inmates," and to work "collaboratively and cooperatively with [mental health care] providers," the court has little information regarding how and whether these contractual provisions were implemented.

A "special relationship" must be based upon the actual interaction between the alleged mental health professional and the alleged patient, not on where there exists a potential for such a relationship under a contract. Based on the record before it, the court cannot determine, as a matter of law, whether a "special relationship" exists between PHS and Mr. Heart. *See Beatie v. City of New York*, 123 F.3d 707, 710-11 (2d Cir. 1997) ("[A] trial court's function is not to weigh the evidence, make credibility determinations or resolve issues of fact, but rather to determine whether, drawing all reasonable inferences from the evidence presented in favor of the non-moving party, a fair-minded jury could find in the non-moving party's favor.") (citation omitted). The court therefore rejects the R & R's recommendation to grant Mr. Barrett's motion for partial summary judgment on his failure to warn/protect claim.

The court also rejects the R & R's conclusion that the "special relationship" requirements of *Peck* do not have to be met if the exigencies of the occasion so demand. Vermont law does not support this exception and the R & R's reliance on *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996) is misplaced. In *Stanford*, the Second Circuit opined that "the duty is dictated and measured by the exigencies of the situation,

and the risk reasonably to be perceived defines the duty to be obeyed." *Id.* at 125. Accordingly, the Second Circuit recognized that the duty in question varies with the circumstances. The court did not hold that a "special relationship" need not exist when the circumstances are exigent. Indeed, exigent circumstances are likely to be present every time a mental health care professional is found to have a duty to warn a third person in order to protect that person from a dangerous patient. In any event, Vermont law does not have an "exigent circumstances" exception to the "special relationship" requirement.

Even were the court to find a "special relationship" between PHS and Mr. Heart, the R & R erroneously relieved Mr. Barrett of the duty to establish that he is an "identifiable victim." The R & R examines the issue solely as one of foreseeability: "[T]he essential question [is] whether the injury to Barrett was a foreseeable hazard of its failure to use due care in performing its DOC contract." (Doc. 90 at 18.) The court agrees with the Magistrate Judge's analysis that, given Mr. Heart's history of assaultive behavior resulting from mental illness, which was contained in his medical records to which PHS had access, it was foreseeable that Mr. Heart would "assault someone in the near future." (Doc. 90 at 22.) However, the court disagrees with the R & R's further conclusion that because the assault was foreseeable, Mr. Barrett need not establish that he was an "identifiable victim." Although a number of courts recognize a duty even when there is no identifiable victim, Vermont does not. The R & R acknowledges *Peck's* insistence on an "identifiable victim," but attempts to dispose of that requirement on public policy grounds, finding a contrary view more persuasive.

This court is bound by the Vermont Supreme Court's precedent and establishment of public policy. *See Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 80 (2d Cir. 1999) (stating that "[w]e must . . . bear in mind that in a diversity case the federal courts are not free to develop their own notions of what should be required by the public policy of the state, but are bound to apply the state law as to these requirements.") (quoting *Cornellier v. Am. Cas. Co.*, 389 F.2d 641, 644 (2d Cir. 1968)); *Smith v. Day*, 148 Vt. 595, 599, 538 A.2d 157, 159-60 (1987) (evaluating and rejecting public policy arguments of

11

plaintiff seeking to expand common law duty of care to university for actions of students, and observing that the public policy arguments favored by plaintiffs were "contrary to established judicial precedent."). In *Peck*, the Vermont Supreme Court held that, in order to impose a duty to warn/protect on a mental health professional, there must be an "identified victim" to whom the warning and protection must be given. It found that "[a] mental patient's threat of serious harm to an *identified victim* is an appropriate circumstance under which the physician-patient privilege may be waived." *Peck*, 146 Vt. at 67, 499 A.2d at 426 (emphasis supplied). The court thus affirmed the trial court's determination that "the therapist's failure to warn the *identified victims* of [the patient's] threat constituted a breach of the duty to take reasonable steps to protect them." *Id.* The Vermont Supreme Court then held in its own right:

> Thus, we hold that a mental health professional who knows or, based upon the standards of the mental health profession, should know that his or her patient poses a serious risk of danger to an *identifiable victim* has a duty to exercise reasonable care to protect him or her from that danger.

*Id.* at 68, 499 A.2d at 427 (emphasis supplied). *Peck* is consistent with the position adopted by a majority of courts that require an identified or identifiable victim in order to find a corresponding legal duty. *See, e.g., Fraser v. United States*, 674 A.2d 811, 815 (Conn. 1996) ("our decisions defining negligence do not impose a duty to those who are not identifiable victims"); *Bradley v. Ray*, 904 S.W.2d 302, 312 (Mo. Ct. App. 1995) (holding that when health care professional knows that patient presents serious danger of violence to readily identifiable victim, that professional has duty under common law to warn the intended victim or communicate the existence of the danger to appropriate authorities); *Thompson v. Cnty. of Alameda*, 614 P.2d 728, 735 (Cal. 1980) ("[W]e nonetheless conclude that public entities . . . have no affirmative duty to warn of the release of an inmate with a violent history who has made nonspecific threats of harm directed at nonspecific victims."); *Glanda v. Tweny Pack Mgmt. Corp.*, 2008 WL 4445257, at * 3 (E.D. Mich. Sept. 29, 2008) ("In the context of special relationships, courts have established a duty of reasonable care toward only those parties who are

12

readily identifiable as being foreseeably endangered.") (quotation marks and citation omitted).

The court also disagrees with the R & R's conclusion that, in this case, PHS's duty to warn may be cabined to DOC employees. If the test is mere foreseeability, Mr. Heart's fellow inmates (as well as non-correctional staff who might encounter Mr. Heart) were also foreseeable victims of his potential for assaults. Indeed, Mr. Barrett's expert, Dr. Patterson, testified: "I think inmates and staff, meaning correctional officers and non-correctional staff would be at risk to be assaulted by Mr. Heart, particularly when he is not well medicated and when he has access to them." (Doc. 62-4 at 2.) Dr. Patterson agreed that a "potential grouping" of those at "particular risk from [Mr. Heart's] assaultive behaviors" could be "just about anybody under [NSCF's] roof." (Doc. 62-4 at 5.) The R & R's conclusion, carried to its logical result, would require PHS to notify all those who were likely to come in contact with Mr. Heart that he was insufficiently medicated. It would impose a similar duty with regard to other inmates whose lack of medication, inadequate dosage, or lack of treatment compliance may pose a risk of harm to others.

As noted previously, § 315 is an exception to the common law principle that a person generally owes no duty to control the conduct of another in order to protect a third person from harm. The *Peck* exception to this rule is limited to a narrow set of circumstances. First, there must be a "special relationship." Second, there must be an "identifiable victim." Because the court concludes that, based on the record before it, these determinations cannot be made as a matter of law, the court does not grant summary judgment to Mr. Barrett on his failure to warn/protect claim.

The court only briefly addresses whether it should grant PHS's cross-motion for summary judgment on the issue of whether Mr. Barrett was an "identifiable victim." The predicate for PHS's liability under *Peck* and § 315 depends on the existence of a "special relationship" which has not been determined. *See Benoit v. Edington*, 2008 WL 4150267, at * 4 (Conn. Super. Ct. Aug. 14, 2008) (opining that the question of whether there was an

13

identifiable victim "only applies if a special relationship is found to exist in the first place"). Whether Mr. Barrett is an "identifiable victim" is generally considered a question of fact. *See Glanda*, 2008 WL 4445257, at * 4 (having found that a special relationship existed between defendants and victim of attack by another patient, court held that "[w]hether the victim is 'readily identifiable' is a question of fact."). Here, any such factual determination is likely to require, among other things, consideration of the prison setting in which the assault occurred, the nature, circumstances, and timing of Mr. Heart's prior assaults and threats against correctional officers, the extent to which Mr. Barrett was likely to come into contact with Mr. Heart, and whether an assault, and the timing thereof, could reasonably be predicted, in the absence of a verbal threat or any prior physical menace, simply because of Mr. Heart's prior history and missed doses of an anti-psychotic medication. The court is not empowered to weigh the competing facts (many of which have not been established) and determine which are the most persuasive on summary judgment. *See Beatie*, 123 F.3d at 710-11. PHS's cross-motion for summary judgment therefore must also be denied.

### B. PHS's Objections Re: the Negligent Undertaking Claim.

The elements of the negligent undertaking claim are set forth in the *Restatement (Second) of Torts* § 324(A) (1965) governing liability to a third person for negligent performance of an undertaking:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a)  his failure to exercise reasonable care increases the risk of such harm, or
>
> (b)  he has undertaken to perform a duty owed by the other to the third person, or
>
> (c)  the harm is suffered because of reliance of the other or the third person upon the undertaking.

§ 324A. The Vermont Supreme Court adopted § 324A in *Derosia v. Liberty Mut. Ins. Co.*, 155 Vt. 178, 182-83, 583 A.2d 881, 883-84 (1990).

PHS sought summary judgment with regard to all of Mr. Barrett's claims, but did not address the negligent undertaking claim with any specificity. In turn, Mr. Barrett sought partial summary judgment regarding whether PHS owed him a duty of care based, in part, on the expert report of Raymond Patterson, M.D. which is not under oath and is thus inadmissible. Fed. R. Civ. P. 56(e)(1) (evidence submitted in support of summary judgment motion and opposition must be admissible).

The parties apparently concede that the remaining components of a negligent undertaking claim must be decided by a jury, including whether PHS was negligent in the first instance. *See Garafano v. Neshobe Beach Club, Inc.*, 126 Vt. 566, 573, 238 A.2d 70, 76 (1967) (question of whether party was "acting as a careful and prudent person under the circumstances" was a "question[ ] of fact . . . clearly for resolution by the jury."); *see also Latremouille v. Bennington & Rutland Ry. Co.*, 63 Vt. 336, 344-45, 22 A. 656, 658 (1891) (negligence is a "mixed question of law and fact, always, under the decisions of this state, to be submitted to the jury").

The R & R discussed the negligent undertaking claim, found a duty of care, and recommended granting Mr. Barrett's partial motion for summary judgment. In doing so, the Magistrate Judge blended its discussion of Mr. Barrett's tort claims and found, collectively, that they support "a legal duty in tort running from PHS to Barrett." (Doc. 90 at 27.) The court agrees with PHS that the R & R's analysis with regard to the negligent undertaking claim is not sufficiently segregated to either adopt or reject, especially in light of this court's rulings on issues that are intertwined in that analysis.

PHS's other objection to the R & R asserts that Mr. Barrett's negligent performance of an undertaking claim is barred by the so-called "Fireman's Rule." PHS acknowledges that, in light of its contractual duties with DOC, and Vermont's recognition of a cause of action for negligent performance of an undertaking pursuant to *Restatement*

*(Second) of Torts* § 324A, it "may otherwise owe a duty of care to Plaintiff but for the application of the Fireman's Rule." (Doc. 92 at 12-13, footnote omitted.)

The Fireman's Rule "is an age-old common law rule that prevents police officers, or public safety officers, and firem[e]n from recovering damages for injuries: (1) deriving from negligence causing the officer[']s presence [on the premises], and (2) stemming from the normal risks of the officer[']s profession." *Whiting v. Central Trux & Parts, Inc.*, 984 F. Supp. 1096, 1105 (E.D. Mich. 1997). Vermont has not adopted the Fireman's Rule, either by statute or through case law.

PHS raised the Fireman's Rule argument for the first time in its Objection. In its Response to PHS's Objections to the R & R, Mr. Barrett listed the many filings where PHS had an opportunity to raise the Fireman's Rule but declined to do so. He contends that PHS has waived the argument.

In *Wells Fargo Bank, N.A. v. Sinnott*, 2010 WL 297830 (D.Vt. Jan. 19, 2010), this court established the standard it would apply when considering a legal argument raised for the first time in an objection to a magistrate judge's report and recommendation. The court ruled that it would be guided by the following factors:

> (1) the reason for the litigant's previous failure to raise the new legal argument; (2) whether an intervening case or statute has changed the state of the law; (3) whether the new issue is a pure issue of law for which no additional fact-finding is required; (4) whether the resolution of the new legal issue is not open to serious question; (5) whether efficiency and fairness militate in favor or against consideration of the new argument; and (6) whether manifest injustice will result if the new argument is not considered.

*Id.* at * 4.

Applying the *Sinnott* factors to this case, the court declines to consider the new argument. First, PHS has offered no reason why it did not raise this argument in the briefing on the cross-motions for summary judgment before the Magistrate Judge. Second, the court is aware of no intervening case or statute that has changed the law with regard to this issue. Third, the new issue is not a pure issue of law, as it is likely to require further briefing and additional fact-finding to determine whether correctional

16

officers receive special salary, disability, and retirement benefits to compensate them for confronting the dangers posed by the officer's assumption of the risk of his employment. *See Hamilton v. Martinelli & Assocs. Justice Consultants, Inc.*, 2 Cal.Rptr.3d 168, 177 (Cal. Ct. App. 2003) (holding that one of the justifications for the Fireman's Rule is that police officers and firefighters "are public employees who receive special salary, disability, and retirement benefits to compensate them for confronting the dangers posed by [the] negligence [that makes their employment necessary].") Fourth, this argument raises an issue of first impression under Vermont law, and the issue is open to serious question. Finally, efficiency and fairness militate against consideration of the new argument, and no manifest injustice will result if the court declines to address it.

This case will remain pending as summary judgment has not been granted to either party. If PHS seeks to litigate whether the Fireman's Rule bars this action, it must move to amend its Answer to add this affirmative defense. The court will not allow amendment by way of an Objection to the R & R.

Based upon the foregoing, the court does not adopt the R & R insofar as it addresses the negligent undertaking claim. The court also does not grant summary judgment to either party on this claim, concluding that the issue of whether a Fireman's Rule defense should be allowed must be decided first.

## CONCLUSION

For the reasons stated above, the court denies Mr. Barrett's motion for partial summary judgment without prejudice to renew. The court also denies PHS's cross-motion for summary judgment without prejudice to renew. This matter will now proceed before the Magistrate Judge consistent with the rulings set forth herein.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 19th day of July, 2010.

Christina Reiss
United States District Court Judge